See also D.C., 136 F.Supp. 157.

Victor D. **LINDEMAN**, Francis Bonner, Katherine Robinson Brainard, as Executrix of the Estate of Millar Brainard, Deceased, and Lincoln Epworth, Plaintiffs-Appellants,

v.

**TEXTRON, INCORPORATED,** Defendant-Appellee.

No. 183, Docket 23816.

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1955.

Decided Jan. 23, 1956.

Day, Epworth, Plaskow & Lawrence, New York City (Milton Pollack, New York City, of counsel, Samuel N. Greenspoon, New York City, on the brief), for appellants.

Cravath, Swaine & Moore, New York City (Ralph L. McAfee, Edward C. Perkins, Jack E. Brown and Jerome T. Orans, New York City, of counsel), for appellee.

Before SWAN, FRANK and LUMBARD, Circuit Judges.

FRANK, Circuit Judge.

This suit (with federal jurisdiction based on diversity of citizenship) was brought by plaintiffs, three financial brokers and the estate of a deceased broker Brainard, for a brokerage commission (a "finders' fee") in finding and presenting to Textron, Incorporated, an advantageous purchase of the inventories, operating assets, and name and good will of Burkart Manufacturing Company. After some eight days of trial when all the evidence for both sides had been received, the trial judge directed a verdict for defendant and entered a judgment dismissing the suit on the merits.

We think the judge erred. The jury could reasonably have returned a verdict for plaintiffs. In so concluding, we necessarily assume that the jury would have believed all the testimony favorable to plaintiffs, ignored or resolved any inconsistencies in that testimony and disbelieved all testimony adverse to plaintiffs. For the jury could give weight to the demeanor of the witnesses and to the discrepancies between the testimony of defendant's witnesses at the trial and in their pre-trial depositions. On the foregoing basis, we shall summarize some important parts of the evidence.[1]

Textron is engaged in the textile business. Market Square Trust, a trust for Textron's employees, wholly owns Midland Enterprises, Inc. On May 15, 1953, Midland contracted to purchase the fixed assets of the Burkart Company, and Textron contracted to buy Burkart's operating assets. Textron could not have made this purchase without the simultaneous purchase by the Trust (i. e., Midland) of the fixed assets, nor could the Trust have engaged in the transaction without the simultaneous purchase by Textron of the other assets. When the purchases were consummated, the fixed assets were leased by Midland to Textron at a rental based on a share of Textron's profits from the operation of the acquired Burkart business.

Little is the principal stockholder in, and Chairman of the Board of Directors of, Textron. Textron appoints and can remove the two trustees who manage the Trust, and can appoint and remove a third Trustee. It was Little who suggested that the Trust buy the Burkart fixed assets; he was in charge of the transaction; he allocated the assets as between Textron and the Trust and conducted the final negotiations for a bank

---

1. The summary does not purport to be exhaustive. Nor, for reasons stated in the text, does it include evidence favorable to the defendant.

loan to the Trust, a loan necessary to its purchase. He testified that the Trust "jointly entered into a venture with Textron under which it purchased the fixed assets and Textron purchased the inventories."

In connection with an earlier transaction, Brainard had obligated himself to give the Trust the first refusal of any new deals. Apparently this obligation did not run to Textron. When Hellmuth, one of the trustees of the Trust, was about to go to Europe, he wrote Brainard, on April 21, 1953, to "keep in contact with Roy Little" regarding the advisability of Brainard's "not bringing the matter" (i. e., the purchase of the Burkart properties) "to General Tire's attention until Textron has exhausted its possibilities." (In his pre-trial deposition, Hellmuth said that the contents of this letter had been the subject of a telephone conversation in which Little, Hellmuth and Brainard participated.)

From the evidence summarized above, one could reasonably infer that Brainard, throughout, had acted as broker for Textron from the time he brought the purchase of Burkart assets to Hellmuth's attention. Textron, to be sure, sought to prove that not Brainard but Scherck, an investment banker, brought Textron this opportunity. According to the testimony of defendant's witnesses, Scherck first talked to Textron (i. e., Little) about the matter on March 26, 1953. But there is also testimony that, at least as early as March 25, Brainard had broached the matter to Hellmuth. (Indeed, in a pre-trial deposition, Hellmuth testified that Brainard had done so before March 15.)

Moreover, and most important, on May 1, in a telephone conversation between Brainard and Little, Brainard said, "I am calling to find out about the Burkart matter." Little replied, "The deal is all but closed." Brainard then asked, "How is my commission to be handled in this matter?" Little answered, "We will handle it * * * in a deferred contract with Textron or one of its interests."[2] This constituted a most damaging admission that Brainard had been acting for Textron and that Textron recognized it owed him a commission.[3]

■ Defendant contends that, no matter what any of the plaintiffs did, none of them was the efficient or procuring cause of the transaction. But Little's admission of May 1 sufficed to allow the jury reasonably to infer that Textron recognized that Brainard had been such a "cause."[4] We summarize, in a footnote,[5] evidence which would have justi-

---

2. In this same May 1 phone conversation, when Brainard inquired about compensation to the others associated with him, Little answered, "Well, I am only interested in taking care of you," and added that Brainard should tell the others "that Gordon Scherck brought the deal to me."

If the jury had believed the testimony as to this phone conversation, they would have accorded little significance to a letter, dated May 5, four days later, from Brainard to Epworth that "as I told you a number of days ago, it [the deal] was brought to the attention of Mr. Little by Gordon Shirk [sic] in St. Louis," and that "the way things have turned out I cannot expect to get anything, not having even a record of having brought the deal to Mr. Little prior to the appearance of the St. Louis broker."

3. There is also testimony from which the jury could have inferred that the fee paid by Textron to Scherck was not a "finder's fee" in connection with the Burkart purchase.

4. Therefore we need not, and do not, consider whether a broker does not earn a commission if the terms of the completed transaction are not the same as those he presented. See Risser v. Hirschhorn, 2 Cir., 199 F.2d 917, 919.

5. In January and February, 1953, Lindeman corresponded with Harry Burkart, President of the Burkart Company, about the sale of the controlling shares of that company. Early in March, plaintiff Bonner, with whom Lindeman had consulted, took up the matter with plaintiff Epworth. It was agreed that Brainard should be asked to negotiate with Hellmuth, one of the two trustees of the Textron Trust. After Epworth, on March 9 and 14, talked to Brainard, the latter said he would bring the transaction to the attention of Little and Hellmuth.

fied the jury in finding that the other plaintiffs were entitled to share in the commission.

■ No part of the negotiations or the purchase occurred in New York. The pivotal events took place in Massachusetts or Rhode Island. Yet defendant argues that, obedient to Klaxon v. Stentor Electric Mfg. Co., Inc., 313 U. S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, we must follow New York conflict-of-law rules, and that therefore the New York Statute of Frauds, Section 31 of the New York Personal Property Law, McK.Consol.Laws, c. 45, is a defense. If, as the jury could have found, Textron was directly obligated to plaintiffs, then subdivision 2 of Section 31 does not apply, since it relates to a promise to answer for the debt of another; for like reason, a similar provision of the statute of Massachusetts or Rhode Island is irrelevant.

■ Subdivision 10 of Section 31 relates to brokers' contracts. Since none of the events of this case occurred in New York, it would be unreasonable to hold that provision applicable. Defendant, arguing contra, cites Rubin v. Irving Trust Co., 305 N.Y. 288, 113 N.E.2d 424, 428, which dealt with subdivision 7, covering a contract " 'to bequeath property or make a testamentary provision of any kind' ". In the Rubin case, plaintiff brought suit on an oral contract made in Florida by a decedent not to alter his will. Decedent had his domicile in New York from the time when the contract was made until his death. The court held that, because of the long-established public policy of New York against oral testamentary dispositions, subdivision 7

governed. A majority of the court (i. e., all but one judge) deliberately refused to hold that all the other subdivisions of the statute would apply to contracts made and to be performed outside New York. The most that can be said is that in New York that question is still open. In such circumstances, we assume that, when the question arises, the New York Court of Appeals will act reasonably; see Cooper v. American Airlines, 2 Cir., 149 F.2d 355, 359. Accordingly, we hold that subdivision 10 does not serve as a defense here.

It is unfortunate that (especially after a long trial) the judge took the case from the jury. As we said in Fratta v. Grace Line, 2 Cir., 139 F.2d 743, 744: "We take this occasion to suggest to trial judges that, generally speaking—although there may be exceptions—it is desirable not to direct a verdict at the close of the evidence, but to reserve decision on any motion therefor and allow the jury to bring in a verdict; the trial judge may then, if he thinks it improper, set aside the verdict * * * and grant the motion, Federal Rules of Civil Procedure, rule 50(b), 28 U.S.C.A., following section 723c, with the consequence that if, on appeal, we disagree with him, we will be in a position to reinstate the verdict, thus avoiding the waste and expense of another trial."

■■ It may be that the judge directed a verdict because he disbelieved witnesses for plaintiffs on crucial points. If so, of course he erred. On a retrial, however, the trial judge may tell the jury his views on the evidence, provided he makes it unmistakably clear that the jury is not obliged to accept them.

Reversed and remanded.