Harold R. **WARSHAY**, Plaintiff,

v.

**GUINNESS PLC**, Defendant.

No. 88 Civ. 3119 (KC).

United States District Court,
S.D. New York.

Nov. 7, 1990.

As Corrected Nov. 19, 1990.

---

Stuart A. Jackson, Kalnick, Jackson, Klee & Green, New York City (Enid W. Langbert, of counsel), for plaintiff.

Douglas D. Broadwater, Cravath, Swaine & Moore, New York City (Larry W. Miller, of counsel), for defendant.

AMENDED * OPINION AND ORDER

CONBOY, District Judge:

Plaintiff Harold R. Warshay ("Warshay") brings this action against defendant Guinness PLC ("Guinness") for breach of an oral "finder's fee" agreement. Currently pending before the Court are Guinness's motions for summary judgment pursuant to Fed.R.Civ.P. 56(c) and for sanctions pur-

---

* This amended opinion and order is a corrected version of our opinion and order dated October 31, 1990.

suant to Fed.R.Civ.P. 11 and 56(g). For the reasons set forth below, both motions are granted.

## I. FACTUAL BACKGROUND

Warshay, a resident of New York, is an investment banker who, in 1986 and early 1987, was a consultant to Arthur Young & Co. ("Arthur Young") in New York. Deposition of Harold R. Warshay at 53, 59.[1] Although, according to Warshay, Arthur Young "was not in the mergers and acquisitions business either by itself or with [him]," Affidavit of Harold R. Warshay, sworn to on July 9, 1990 ("Warshay 7/9/90 Aff."), ¶ 19, Arthur Young's New York office staked the costs of Warshay's merger and acquisition activity outside New York in exchange for sharing in any fees generated by Warshay's activity. *Id.* Thus, Warshay used Arthur Young's New York office to make telephone calls, send and receive correspondence, and do research in connection with his work. He reported to James O. Lippert ("Lippert"), a partner at Arthur Young's New York office, and submitted expense reports for travel outside of New York for Lippert's approval. Arthur Young's New York office also introduced Warshay to its European offices.

### A. *Warshay's Agreement with Guinness*

According to Warshay,[2] in October 1986 Meshulam Riklis ("Riklis"), then the owner of Schenley Industries, Inc. ("Schenley"), a liquor distributor, called him in Los Angeles, California and asked him to come to Denver, Colorado to meet with Riklis. (Warshay 89) Warshay flew to Denver that night and met with Riklis the next day. (Warshay 102) Riklis told Warshay that he would like Warshay to try to sell Schenley,

then a Delaware Corporation headquartered in Texas, to a European buyer. (Warshay 103) Riklis provided Warshay with confidential financial information which Warshay later took down on two yellow sheets of paper (which no longer exist). (Warshay 338–39)

Warshay left immediately for Paris. From Paris he made a day-trip to London (Warshay 304), where he discussed the Schenley acquisition with Richard Mead ("Mead"), head of mergers and acquisitions at the London office of Arthur Young. Mead suggested that Guinness would be the "best fit" and informed Warshay that the person to contact at Guinness was Olivier Roux ("Roux"), the London-based Chief Financial Officer of Guinness and the person in charge of mergers and acquisitions. (Warshay 127)

Warshay spoke to Roux that day by telephone from Mead's office. During the course of their conversation, Roux agreed to compensate Warshay in accordance with the "Lehman formula"[3] if Guinness acquired any company identified by Warshay as available for acquisition. Warshay then informed Roux that Schenley was available for acquisition. Roux expressed astonishment that Schenley was available for sale and said that he was definitely interested although he was involved with other matters and would not be able to consider such an acquisition immediately. (Warshay 142–50)

In November of 1986, Warshay met Riklis a second time at Riklis's New York office. At this meeting, Riklis gave Warshay a two-page computerized printout containing confidential financial information about Schenley. (Warshay 344) Soon thereafter, Warshay returned to London and again called Roux from Arthur

---

**1.** Citations in the form "(Name ____)" refer to deposition testimony taken in this action.

**2.** For the purposes of this summary judgment motion, we accept Warshay's version of the facts concerning the agreement, as expressed in Warshay's affidavits and deposition testimony, although these facts are disputed. In this section, we rely primarily on Warshay's summary of the relevant facts contained in his memorandum in opposition to the renewed motion of

Guinness for summary judgment and for sanctions ("Pltf.Mem.") at 5–11.

**3.** According to this formula, when a company is purchased, the finder is paid a fee consisting of 5% of the first million dollars of the purchase price, 4% of the second million, 3% of the third million, 2% of the fourth million and 1% of the remainder of the purchase price. Affidavit of Malcolm Christopher Keogh, sworn to on June 28, 1990 ("Keogh Aff."), ¶ 34.

Young's London office. Warshay and Roux met in a hotel near Roux's office and Warshay gave Roux a copy of the data sheets he had received from Riklis. Upon seeing the printout, Roux finally appeared truly convinced of Schenley's availability. (Warshay 339) In addition, Roux reaffirmed his interest in Schenley, his current involvement in other matters, and his fee agreement with Warshay. (Warshay 153–60)

In January of 1987, Warshay again called Roux from London. (Warshay 160–61) By that time, however, Roux had left Guinness, and Warshay called him at a number supplied to him by the Guinness office. (Warshay 535–37) Warshay never contacted anyone else at Guinness concerning the acquisition of Schenley until he learned months later that Guinness had, in fact, acquired Schenley. (Warshay 163–64)

### B. *Guinness's Acquisition of Schenley* [4]

On September 16, 1987, Guinness America, a Guinness subsidiary then located in New York,[5] entered into a purchase agreement to acquire certain of the assets of Schenley. The purchase agreement was executed in New York and is governed by New York law. The closing took place in New York on October 20, 1987. In addition, in the negotiation of the purchase agreement and at the closing, all parties were represented by attorneys located in New York.

At the time of Warshay's contacts with Guinness, and until its acquisition by Guinness America, Schenley was Guinness's largest distributor in the United States. In November 1986, Guinness transferred to Schenley its trademark in its Dewar's brand of Scotch whiskey. In early 1987, Guinness determined that efforts should be undertaken to recover its Dewar's trademark. In February 1987, representatives of Guinness met with representatives of Schenley to discuss, among other things, the recovery of the Dewar's trademark.

In March 1987 Guinness was informed by Seagram that Seagram was interested in acquiring Schenley. After learning of Seagram's interest, Guinness informed Seagram that it would not approve an acquisition of Schenley by Seagram (such approval by Guinness was apparently required by agreement between Guinness and Schenley), and began discussions with Schenley regarding a possible acquisition of Schenley. The acquisition of Schenley by Guinness America occurred after months of discussions and negotiations beginning at that time.

## II. PROCEDURAL HISTORY

Guinness initially moved to dismiss this action on the pleadings, arguing that New York law should apply and that Warshay's claim was barred by New York's Statute of Frauds provision with respect to alleged oral agreements for finder's fees agreements, N.Y.Gen.Oblig.L. § 5–701(a)(10). After the Court determined that this issue should be determined on a motion for summary judgment (*see* Memorandum Endorsement dated April 4, 1989), Guinness moved for summary judgment. Guinness argued that because Warshay was, according to his affidavit submitted in opposition to the motion to dismiss, a New York-based finder, Affidavit of Harold R. Warshay, sworn to on June 24, 1988 ("Warshay 6/24/88 Aff."), ¶ 3, there was sufficient contact with New York to warrant the application of New York law.

In opposition to Guinness's motion for summary judgment, however, Warshay submitted a second affidavit in which he explained that, at the time of his agreement with Guinness, he was working in London. Affidavit of Harold R. Warshay, sworn to on May 19, 1989 ("Warshay 5/19/89 Aff."), ¶ 5. Specifically, Warshay averred:

---

4. The following facts and circumstances surrounding Guinness's acquisition of Schenley are adopted primarily from the Statement of Guinness PLC Pursuant to Local Rule 3(g) ("Def. 3(g)"), ¶¶ 12–28, and are undisputed unless otherwise indicated.

5. In 1986 and early 1987, Guinness America operated out of the New York office of the Distillers/Somerset Group, Inc. Guinness America is currently located in Connecticut.

Although I presently maintain an office in my home in New York through which a substantial portion of my investment banking business passes, at the time of the promise to pay me a fee and for about nine months prior thereto, and for approximately six months thereafter, I worked in Europe, with an office in London, England. During this approximate fifteen month period, from London, I visited France and Germany during which I pursued a variety of investment banking opportunities.

*Id.* In his affidavit, Warshay made no mention of his affiliation with Arthur Young's New York office, outlined earlier, or of the meeting he had with Riklis in New York. To the contrary, Warshay declared, "New York has not had a single contact with any aspect of the promise which is the basis for this litigation." *Id.* ¶ 4. By memorandum endorsement dated July 14, 1989, the Court denied the motion for summary judgment without prejudice to its renewal at trial.

Guinness has now renewed its motion for summary judgment, contending that discovery has revealed that Warshay was affiliated with Arthur Young's office in New York and was not based in London.[6] Guinness again argues that this action should be governed by New York law and is therefore barred by the Statute of Frauds. In the alternative, Guinness argues that, assuming this action is governed by English law, Warshay cannot meet his burden of showing that he was the "effective cause" of the Schenley acquisition. Warshay responds first that English law should apply, or at least that issues of fact preclude a choice of law determination on summary judgment. Warshay further responds that he need not prove that he was the "effective cause" of the acquisition. Even assuming "effective causation" is an element of his claim, Warshay contends that issues of fact remain on this issue, precluding summary judgment.

**6.** Guinness also moves for sanctions on the ground that Warshay's submissions on Guinness's first motion for summary judgment were

## III. DISCUSSION

Summary judgment may be granted only when the moving party can establish, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party bears the initial burden of establishing that no genuine dispute as to material facts exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Only disputes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### A. Choice of Law

■ As a federal court sitting in a diversity action, we apply the choice of law rules of the state in which the case was brought, *Klaxon Co. v. Stentor Electric Manufacturing Co. of North America,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), in this case New York. New York courts apply a "paramount interest" test to choice of law issues involving contractual disputes. Under such a test, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969) (citing *Miller v. Miller,* 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968)). Applying this test, we conclude that a New York court would apply New York law to Warshay's contract claim.

unfounded and deliberately misleading in that they denied Warshay's New York ties and mischaracterized his connections with London.

### 1. New York-based finder

Warshay, according to his most recent affidavit, "considered London the center of [his] investment banking activity in 1986 and early 1987." (Warshay 7/9/90 Aff. ¶ 11.) The undisputed facts establish, however, that Warshay is a New York-based finder. Throughout his career, Warshay has lived and worked in New York—the years 1986 and 1987 were no exception. As indicated earlier, from early in 1986 until February or March 1987, Warshay was associated with Arthur Young in New York (Lippert 6–7, 9–11; Mead 6; Warshay 239–41; Affidavit of Larry W. Miller, sworn to June 25, 1990 ("Miller 6/25/90 Aff.") Exhs. 2, 10–12), and also carried on an independent "investment banking" business. Insofar as Warshay was associated with Arthur Young, his base of operations was in New York City. (Lippert 78) Insofar as Warshay worked independently of Arthur Young, he carried on his business under the name HRW Associates, whose address is and was Warshay's home on Long Island, New York. (Warshay 220–21, 290)

While associated with Arthur Young, Warshay reported to James O. Lippert, a partner at Arthur Young's New York office, and submitted expense reports for travel outside of New York for Lippert's approval. Warshay had and made regular use of an office, which he shared with other consultants, at Arthur Young's office on Park Avenue. Warshay used that office, and Arthur Young's New York offices generally, to make telephone calls, to send and receive correspondence, and to do research in connection with his work. (Lippert 12–14; Warshay 252, 277–80, 282–83, 285–87) In exchange for these benefits, Warshay split his fees with Arthur Young's New York office. Indeed, Warshay states that the New York office of Arthur Young is entitled to 50% of the $4.8 million fee that Warshay is claiming in this action. (Warshay 7/9/90 Aff. ¶¶ 24–25, Warshay 488)

Warshay attempts to minimize these extensive New York contacts. He submits that he never had any responsibilities at Arthur Young in New York, nor did he have a written agreement with the firm.[7] Referring to both his home and Arthur Young's New York office as "mail drop[s]" (Warshay 7/9/90 Aff. ¶ 15), Warshay explains that he received mail at his home in New York merely for his wife to forward to him wherever he was. *Id.* ¶ 14. Warshay further explains that he kept with him stationery with his New York letterhead, which he used regardless of where he was, simply for the "convenience" of having all mail received in one place. *Id.* ¶ 15. In any event, Warshay states that he received very few letters at these New York locations, none of which involved the Guinness–Schenley transaction. *Id.* He declares that he typically used hotel services in the cities where he worked or a law firm with which he was friendly or the secretarial services of a corporation. *Id.* ¶ 14. He further explains that he generally carried documents with him as he traveled, and that he kept some files in Paris in 1986. *Id.* ¶ 17.

Warshay's efforts to downplay his New York contacts notwithstanding, Warshay's affiliation with Arthur Young in New York and his New York residency and addresses establish him as a New York-based finder. A review of Warshay's London contacts supports this conclusion. Despite references in his second affidavit, dated May 19, 1989, to a London office, Warshay had no London office, nor was London the center of his operations. What Warshay described as "my London office" was the London office of Arthur Young, with which Warshay was not associated. (Lippert 15; Mead 7, 12) Rather, as a courtesy to the New York office of Arthur Young, the London office would make a telephone and secretarial help available to Warshay if he visited London, as they would have done for "any other visiting member or associate of our firm … to help him ease … his professional life whilst he was in London." (Mead 7) Warshay concedes he had no office as such: "I generally notified the partner in charge of the respective European M

---

**7.** An agreement was drafted, but never exe-    cuted. *See* Miller 6/25/90 Aff. Exh. 10.

& A office that I was coming, and when I got there, they provided me with office space." (Warshay 65)

Nor did Warshay visit London or Arthur Young's office there with any frequency. Warshay's expense reports, submitted to and paid for by Arthur Young in New York and covering the period from May 1986 through February 1987, show Warshay being in London on five occasions, for a total of seven days. *See* Miller 6/25/90 Aff., Exh. 18. Warshay believes, although he cannot recall them specifically, that he took a few other trips that were not reflected in the expense reports. (*See* Warshay 305–06) He estimates that he made six to eight trips to Arthur Young's London office during his year-long association with Arthur Young and he recalls no trips to London that lasted more than a week. (Warshay 265) Asked whether Warshay had been to his offices an average of one time a month, Mead testified, "I guess in some months it might have been twice and then there might have been a gap of two or three months, even, when he didn't appear." (Mead 13) To the extent that Warshay traveled to Europe at all, he spent more time in Paris than in London. (Warshay 65, 312) Contrary to Warshay's conclusory assertions, the undisputed facts—his association with Arthur Young in New York, including the fee-splitting arrangement, and his New York residence and mailing address—establish that Warshay is a New York-based finder who traveled extensively to Paris, Munich, California and London in the course of his business.

Warshay's status as a New York-based finder invokes New York's strong interest, expressed unequivocally in the enactment and implementation of Section 5–701(a)(10) of the General Obligations Law, "in regulating and monitoring the activities of New York based finders and in encouraging the use of those finders by nonresident principals." *Fort Howard Paper Co. v. William D. Witter Co.*, No. 83 Civ. 6588, slip op. at 10, 1985 WL 1402 (S.D.N.Y. May 17, 1985), *aff'd in relevant part*, 787 F.2d 784 (2d Cir.1986). The New York state legislature enacted Section 5–701(a)(10) in response to a growing concern that "in the absence of the requirement of a writing, unfounded and multiple claims for commissions [were] frequently asserted," *Daystrom*, 24 N.Y.2d at 383, 300 N.Y.S.2d at 826, 248 N.E.2d at 582 (quoting 1949 Report of N.Y.Law Rev. Comm. [N.Y.Legis.Doc., 1949, No. 65(G)], p. 615), to the detriment of New York's reputation as "a national and international center for the purchase and sale of businesses and interests therein." *Id.* To protect that reputation and "encourage[] the use of New York brokers and finders by foreign principals," *id.* at 384, 300 N.Y.S.2d at 827, 248 N.E.2d at 583, the New York legislature determined that finder's fee agreements, to be enforceable, must be in writing. "New York therefore has a special interest in applying its statute to [a claim for a broker's fee] when made in a court of this state by a New York broker...." *Ames v. Ideal Cement Co.*, 37 Misc.2d 883, 890, 235 N.Y.S.2d 622, 628 (N.Y.Sup.Ct.1962). Indeed, as far as the Court is aware, no New York State or Federal court has ever allowed a New York-based finder to proceed with a claim based on an oral agreement. *See, e.g., Fort Howard; Flammia v. Mite Corp.*, 401 F.Supp. 1121 (E.D.N.Y.1975), *aff'd* 553 F.2d 93 (2d Cir.1977); *Daystrom.*

### 2. Other New York contacts

Warshay attempts to distinguish the above-cited cases by pointing out that in those cases the finder's location in New York was one of many New York contacts. For example, in *Fort Howard*, the letters and telephone calls that led to the execution of the alleged finder's agreement emanated from the finder's New York office, and "the services for which the finder claimed compensation were substantially rendered in New York." 787 F.2d at 790. Similarly, in *Daystrom*, 1) the defendant came to New York to obtain the services of a finder, 2) the finder sought a suitable acquisition in New York, 3) the acquired corporation had responded to the finder's New York solicitation in the New York Wall Street Journal, 4) the finder introduced the principals of the merger to each other in New York, 5) a finder's fee agreement was negotiated in New York between

the parties, and 6) the principals agreed to compensate the finder during a meeting in New York. Thus, as in *Fort Howard*, the "services for which plaintiff claim[ed] compensation were substantially rendered in New York." 24 N.Y.2d at 384, 300 N.Y.S.2d at 827, 248 N.E.2d at 583.[8] Conversely, Warshay contends, the events leading to Warshay's alleged agreement with Guinness occurred primarily in London: Warshay called Roux in London from Arthur Young's London office and gave him the computerized financial data in a hotel in London. Warshay argues that because "[a]ll of the contacts between Warshay and Guinness occurred in London" (Pltf. Mem. at 30), it would be unreasonable to hold New York law applicable. *See Lindeman v. Textron, Inc.*, 229 F.2d 273, 276 (2d Cir.1956).

Warshay's status as a New York-based finder, however, is not the only contact this litigation has with New York. Warshay's second meeting with Riklis occurred at Riklis's office in New York. During that meeting, Warshay received a computerized printout of financial information from Riklis. *See* Affidavit of Stuart A. Jackson, sworn to on July 9, 1990 ("Jackson Aff."), Exh. 2. According to Warshay, it was not until November 1986, when he provided this document to Roux at a hotel in London, that Roux was convinced that Schenley was actually available. (Warshay 339–40) Whether or not this story is true, on his own testimony, Warshay could not have prompted Guinness's interest in Schenley but for his meeting with Riklis in New York. Thus, Warshay's meeting with Riklis in New York was an important part of the services for which Warshay seeks compensation and therefore a significant New York contact. *See Fort Howard*, 787 F.2d at 790 (emphasizing contacts involving services for which finder seeks compensation);

*Daystrom*, 24 N.Y.2d at 384, 300 N.Y.S.2d at 827, 248 N.E.2d at 583 (same).

Warshay suggests that this contact with Riklis is irrelevant because Warshay's performance under his oral agreement with Roux was already complete at the time of his meeting with Riklis. All his contract required, Warshay argues, was that he identify to Roux an American liquor company that was available for sale. According to this interpretation, Warshay had fully performed his obligation under the contract when he identified Schenley to Roux in October 1986. Pltf. Mem. at 11. This analysis relies in turn on Warshay's argument that his oral agreement did not require him to be the "effective cause" of Guinness's acquisition of Schenley. As we discuss below (see *infra* at 19–21), we reject this argument. Nor is the fact that the meeting occurred in New York merely fortuitous, as Warshay suggests, in light of his and Riklis's jetsetting lifestyles. To the contrary, a meeting in New York of two people who have offices in New York is to be expected. Accordingly, we consider Warshay's meeting with Riklis in New York to be a significant and relevant New York contact.

### 3. Situs of the merger

Guinness argues that another relevant New York contact is the consummation in New York of the Schenley acquisition, pursuant to a purchase agreement negotiated in part in New York by New York lawyers and investment bankers, executed in New York, and governed by New York law. *See generally* Affidavit of William L. Ellis, Jr., sworn to on June 30, 1988. Although the Second Circuit has observed that "[s]uch contacts implicate New York's interest as a national business capital attractive as a location for the negotiation of corporation control transactions," *Hutner v. Greene*, 734 F.2d 896, 899 (2d Cir.1984),

---

**8.** If significant contacts with New York exist, New York courts will apply New York law to claims for finder's fee even if the finder is not based in New York. *See, e.g., Holding Capital Group v. AP and Company Ltd.*, 673 F.Supp. 1274 (S.D.N.Y.1987) (finder based in Israel, alleged oral agreement made in New York, finder's presentation to acquiring company in New

York, acquisition consummated in New York); *Pallavicini v. Int'l Tel. & Tel. Corp.*, 41 A.D.2d 66, 341 N.Y.S.2d 281 (1st Dep't 1973) (finder a resident of Italy and Liechtenstein who called defendant from New York and sent letters from New York), *aff'd*, 34 N.Y.2d 913, 359 N.Y.S.2d 290, 316 N.E.2d 722 (1974).

finders, unlike brokers, do not play a role in the negotiation, drafting and signing of a purchase agreement and closing documents. Finders do not have to negotiate the transaction to earn their fee. *Ames v. Ideal Cement Co.*, 37 Misc.2d at 886, 235 N.Y.S.2d at 625; *see also Train v. Ardshiel Assoc., Inc.*, 635 F.Supp. 274, 279 (S.D. N.Y.) (discussing role of finder), *aff'd*, 805 F.2d 391 (2d Cir.1986). Thus, the New York Court of Appeals has commented that "[t]he place of the actual merger negotiations between the principals is of no significance, since our sole concern in this case is with the agreement concerning plaintiff's right to a finder's fee and not the eventual merger...." *Daystrom*, 24 N.Y.2d at 384, n. 8, 300 N.Y.S.2d at 827, n. 8, 248 N.E.2d at 583, n. 8; *see also Fort Howard*, slip op. at 8 (situs of the merger is "of no moment").

Because New York's interest in the action in *Daystrom* was plain, given that the plaintiff broker was a New York corporation who met the president of the company to be acquired in New York, solicited the acquiring company in a New York newspaper, and introduced the principals of the two companies at a meeting in New York, Guinness argues that the quoted footnote from *Daystrom* merely suggests that the fact that transaction was not completed in New York will not overcome New York's interest in applying its law. *See also Fort Howard*, slip op. at 8 (transaction completed in Wisconsin). We do not read *Daystrom* so narrowly. *Daystrom* teaches that, in determining the applicable law, the most important contacts are those involving the finder's efforts to get the principals together, that is, the contacts involving the services for which the finder seeks compensation. *Daystrom*, 24 N.Y.2d at 384, 300 N.Y.S.2d at 827, 248 N.E.2d at 583; *see also Fort Howard*, 787 F.2d at 790. As a finder, Warshay would probably not have been involved in the contract negotiations and the merger itself. Thus, although the situs of the merger in New York is a relevant consideration, *see Hutner*, 734

F.2d at 899, it does not weigh heavily in the choice of law analysis.

■ Nevertheless, the contacts in this action, including Warshay's status as a New York-based finder and the meeting with Riklis in New York, support the choice of New York law. Applying New York's strict proscription of oral finder's fee agreements to bar a claim by a New York-based finder against a foreign company is "in keeping with this State's policy of reducing unfounded and multiple claims and preserving New York's role as a national and international center for the purchase and sale of businesses." *Holding Capital Group, Inc. v. AP and Co. Ltd.*, 673 F.Supp. 1274, 1277 (S.D.N.Y.1987). By contrast, Great Britain, whose law Warshay attempts to invoke, "has no interest in having its lack of protection for its residents used to establish their liability in a suit brought by residents of other jurisdictions when the laws of the foreign State offer a complete defense to the action." *Daystrom*, 24 N.Y.2d at 385, 300 N.Y.S.2d at 828, 248 N.E.2d at 584. We further conclude that New York has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981). Accordingly, Warshay's claim, which is based on an oral finder's fee agreement, is barred by New York's Statute of Frauds, N.Y.Gen. Oblig.Law § 5–701(a)(10), which bars oral finder's fee contracts. *See Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 266, 401 N.Y.S.2d 176, 180, 372 N.E.2d 12, 15 (1977).

### B. *Effective Causation*

■ Having determined that New York law applies, we need not address Guinness's alternative argument, that Warshay cannot meet his burden under English law, assuming it applies, of showing that he was the "effective cause" of the Schenley acquisition.[9] Nevertheless, Guinness is also en-

---

**9.** It appears that Warshay would have the same burden under New York law. A finder "finds,

interests, introduces and brings the parties together for the deal which they themselves nego-

titled to summary judgment on this ground.

Under English law, Warshay is not entitled to any compensation on his finder's fee claim unless he shows that he was the "effective cause" of Guinness's acquisition of Schenley. *See* Affidavit of Geoffrey Charles Vos, sworn to on June 22, 1990 ("Vos 6/22/90 Aff."), ¶ 4. As Lord Justice Woolf summarized in *Brian Cooper & Co. v. Fairview Estates (Investments) Ltd.* (1987) 282 EG 1131,

> the combined effect of a series of cases starting in 1903 with the case of *Millar Son & Co. v. Radford* (1903) 19 TLR 575 and concluding with the case of *Lordsgate Properties Ltd. v. Balcombe* (1985) 274 EG 493 makes it clear that, in the absence of clear language to the contrary, the courts will always imply a term that commission is earned only if the estate agent is an effective cause of the letting or sale which is the subject of the claim.

Thus, "[t]he right to a commission [does] not arise out of the mere fact that agents ... introduce[ ] a tenant or a purchaser." *Millar v. Radford* (1903) 19 TLR 575.

Relying on *Brian Cooper*, in which the court held that an effective causation term should not be implied in the contract at issue, Warshay argues that his agreement with Guinness did not require him to be the effective cause of the Schenley acquisition. The result in *Brian Cooper*, however, was clearly an exception to the general rule, based on the court's determination that to imply an effective causation requirement would be inconsistent with the explicit terms of the finder's fee agreement at issue. *See* Affidavit of Geoffrey Charles Vos, sworn to on July 12, 1990 ("Vos 7/12/90 Aff."), ¶ 8. Here, implying an effective causation term is not inconsistent with the alleged agreement. Warshay's

assertion that Guinness agreed to pay commission "without ... requiring that Mr. Warshay or the information communicated by him [should] constitute the effective cause of the subsequent acquisition" (Statement of Harold R. Warshay Pursuant to Local Rule 3(g), ¶ 4), is also unavailing because "[t]he question in English law is not whether the parties expressly agreed upon a requirement of effective causation, but whether they expressly agreed to *exclude* such a requirement." (Vos 7/12/90 Aff. ¶ 15.) Because Warshay and Roux did not exclude a requirement of effective causation, English courts would imply such a term.

As Guinness's Rule 3(g) Statement and Warshay's response thereto make clear, Warshay was not the effective cause of Guinness's acquisition of Schenley. Warshay admits that he never spoke to anyone at Guinness other than Roux (Statement of Guinness PLC Pursuant to Local Rule 3(g) ("Def. 3(g)") ¶ 18), that he never told Riklis of Guinness's interest in acquiring Schenley (*id.* ¶ 20), and that he played no role in Guinness's discussions with Schenley regarding a possible acquisition of Schenley (*id.* ¶ 21). In short, Warshay's role, for which he seeks compensation of $4.8 million, was limited to identifying Schenley to Roux during a single telephone call, and to providing Roux with certain financial data at a meeting at a hotel in London.

This role concededly had nothing to do with the Schenley acquisition, for Guinness's interest in acquiring Schenley was effectively caused by events wholly independent of Warshay. Concerned about transfer of the Dewar's trademark in November 1986 (Def. 3(g) ¶ 23), Guinness decided to recover that trademark (*id.*). Guinness began discussions on that subject with Schenley in February 1987 (*id.* ¶ 24). After learning in March 1987 of Seagram's interest in acquiring Schenley (*id.* ¶ 26),

---

tiate and consummate." *Ames v. Ideal Cement Co.*, 37 Misc.2d at 886, 235 N.Y.S.2d at 625 (N.Y.Sup.Ct.1962). Thus, a finder must "show ... that the final deal which was carried through flowed directly from his introduction of the matter." *Seckendorff v. Halsey, Stuart & Co.*, 234 A.D. 61, 71, 254 N.Y.S. 250 (1st Dep't 1931), *rev'd on other grounds*, 259 N.Y. 353, 182

N.E. 14 (1932). *See also Lehman v. Arlen Operating Co.*, 54 Misc.2d 372, 375, 282 N.Y.S.2d 837, 840 (N.Y.Sup.Ct.1967) ("a person may be entitled to a finder's fee in a special business situation for merely introducing and bringing the parties together to conduct their own negotiations, if that is his agreement with the owner").

"Guinness informed Seagram that it would not approve an acquisition of Schenley by Seagram and began discussions with Schenley regarding a possible acquisition of Schenley." (*Id.* ¶ 27) These discussions eventually led to the deal between Guinness and Schenley.

Despite these undisputed facts, Warshay maintains that there is a genuine issue of material fact as to whether he was the effective cause of the Schenley transaction. Because Guinness was "concerned that Riklis might try and sell Schenley" (Jackson Aff. Exh. 11 (letter dated January 29, 1987 from Shaun Dowling to William G. Pietersen)) as early as January 1987, before the offer by Seagram, Warshay speculates that Guinness must have been told by Warshay in the fall of 1986 that Schenley was available. At the very least, Warshay asserts, "the origins of Guinness' concern ... that Schenley would be sold is shrouded in mystery." Pltf.Mem. at 48. That Warshay may have identified Schenley to Guinness in October 1986, is irrelevant, however, in light of the events leading up to the Schenley acquisition. Those events establish that the effective cause of the acquisition was Seagram's offer to acquire Schenley, which occurred nearly six months after Warshay's alleged contact with Roux, and Guinness's concern over the Dewar's label.

Warshay also attempts to create an issue of fact concerning the financial data he allegedly gave to Roux. Citing the deposition of William G. Pietersen, a Guinness employee, he suggests that Michael Julien ("Julien"), who replaced Roux as Guinness's chief financial officer, "formed the opinion that the acquisition of Schenley was within Guinness's financial ability" in January 1987. Pltf.Mem. at 49. From this assertion, Warshay leaps to the assumption that "Mr. Julien must have had before him information concerning both the asking price of Schenley and the projection of income that Schenley would bring to Guinness" at that time (*id.* at 50) and leaps yet again to the conclusion that "the financial information upon which Mr. Julien relied must have come via the route of Riklis to

Warshay to Roux in October 1986." *Id.* at 51.

Warshay's premise—that Pietersen "admitted to discussing ... the financial capacity of Guinness to acquire Schenley" with Michael Julien in January 1987 (and that Julien formed some view at that time) —is false. What Pietersen said on the page cited by Warshay was that he discussed this subject with Julien "when he came on board." (Pietersen 38) As Pietersen's and Shaun Dowling's testimony make clear, Julien did not "come on board" until March 1987, after Guinness and Schenley admittedly were in direct negotiations for the reasons outlined above. *See* Def. 3(g) ¶¶ 23–27. Moreover, Warshay's theory is founded on conjecture. As such, it presents no basis for preventing summary judgment, for "a party may not rely upon mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Warshay's reliance on the affidavit of Ian Michael Cheshire, formerly an employee of Guinness, is also unavailing. Cheshire avers that

> [i]t is my recollection, from [a briefing in March 1987], that the availability of Schenley for sale and the possibility of its acquisition by Guinness had been discussed at Guinness in the autumn of 1986. I do not recall from my briefing who it was that introduced Schenley to Guinness as an acquisition possibility and advised Guinness of Schenley's availability for sale.

Affidavit of Ian Michael Cheshire, sworn to on June 3, 1990 ("Cheshire Aff."), ¶ 3. According to Warshay, Cheshire's affidavit

> unequivocally demonstrates that Guinness had knowledge of both (i) Schenley's availability, long before the Seagram offer was made; and (ii) Schenley's finances, before that information was otherwise dir[e]ctly made available from Schenley to Guinness—information it could only have received from Warshay.

Pltf.Mem. 51. Yet, it is plain from Cheshire's affidavit that he has no personal knowledge, does not claim to know, and does not even claim to have been told that Guinness had knowledge of Schenley's availability in the fall of 1986, or that the source of the information provided him in mid-March was anyone other than Schenley itself. In fact, by the time of Cheshire's briefing, Guinness had already received financial information from Schenley. *See* Affidavit of Larry W. Miller, sworn to on July 13, 1990 ("Miller 7/13/90 Aff.") Exh 2. Thus, Cheshire's affidavit is of no help to Warshay. Moreover, it fails to satisfy Fed. R.Civ.P. 56(e), which requires affidavits submitted in opposition to a motion for summary judgment "to be made on personal knowledge, [to] set forth such facts as would be admissible in evidence, and [to] show affirmatively that the affiant is competent to testify to the matters stated therein."

Because Warshay has not, and cannot, establish that he was the effective cause of Guinness's acquisition of Schenley, he is not entitled to a finder's fee pursuant to his alleged agreement with Guinness.

### C. *Sanctions*

■ Guinness moves for sanctions under Rules 11 and 56 of the Federal Rules of Civil Procedure based on Warshay's submissions in opposition to Guinness's first motion for summary judgment. In his affidavit in response to Guinness's initial motion, Warshay asserted that, at the time of his agreement with Guinness, he was working in London. Warshay 5/19/89 Aff. ¶ 5. Warshay made no mention of his affiliation with Arthur Young's New York office or of the meeting he had with Riklis in New York. To the contrary, Warshay declared, "New York has not had a single contact with any aspect of the promise which is the basis for this litigation." *Id.* ¶ 4. The brief Warshay submitted with his second

affidavit echoed these assertions. (*See* Plaintiff Harold Warshay's Memorandum in Opposition to Defendant Guinness PLC's Motion for Summary Judgment at 3, 4, 8, 12 and 14)

These assertions were misleading in that the brief and affidavit omitted any mention of Warshay's extensive New York contacts and how his London contacts in fact arose out of his New York contacts. As we have determined, see *supra* at 9–12, Warshay was a New York-based finder associated with Arthur Young's New York office. London was not "the center of [Warshay's] investment banking operations." *Id.* at 14. Warshay had no London office (when in London, he visited Arthur Young's London office), nor did he visit London often (he made six to eight trips to London, none lasting more than a week, during his year long association with Arthur Young). Indeed, to the extent that he traveled to Europe, Warshay admits that he spent more time in Paris than in London. (Warshay 65, 312)

That these omitted facts came to light in discovery is not, as Warshay blithely suggests, simply the result of "increased recollection of trivial details." Pltf.Mem. at 56. Warshay's New York contacts were not trivial nor easily overlooked. Given the importance of Warshay's respective New York and London connections to the choice of law question, we conclude that the affidavit and brief were prepared either without "reasonable inquiry" or for the purpose of causing "unnecessary delay or needless increase in the cost of litigation." Fed.R. Civ.P. 11.[10] "Where baseless allegations are used to prevent summary judgment," Rule 11 sanctions are particularly appropriate. *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1473 (2d Cir.1988), *rev'd on other grounds sub nom. Pavelic & LeFlore v. Marvel Entertainment Group*, —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

---

**10.** Rule 11 provides, in relevant part:
The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

As to the amount and type of sanction, Rule 11 gives the Court the discretion to fashion "an appropriate sanction." Fed.R. Civ.P. 11. This includes the authority to impose a financial penalty, *see Four Keys Leasing & Maintenance Corp. v. Simithis*, 849 F.2d 770, 774 (2d Cir.1988); *Donaldson v. Clark*, 819 F.2d 1551, 1557–58 (11th Cir. 1987); *Dore v. Schultz*, 582 F.Supp. 154, 158 (S.D.N.Y.1984), as long as it is imposed in accordance with due process. *Donaldson*, 819 F.2d at 1558. Because of the punitive character of a fine, some commentators and courts have suggested that a court should follow the procedural safeguards of criminal contempt proceedings, which include notice, an opportunity to respond, and a hearing, when imposing a fine under Rule 11. *See, e.g.*, Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 202 (1985); *Miranda v. Southern Pacific Transp. Corp.*, 710 F.2d 516, 523 (9th Cir.1983). A monetary sanction under Rule 11, however, differs from the more severe sanction of criminal contempt. *Miranda*, 710 F.2d at 521. Indeed, "[t]he court's power to impose appropriate sanctions on attorneys practicing before it 'springs from a different source than does the power to punish for criminal contempt.'" *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir.1985) (citation omitted). Moreover, to require courts to follow Fed. R.Crim.P. 42(b) procedures whenever they contemplate imposing a monetary sanction would cause an increase in unnecessary litigation by mandating extensive collateral procedures as prerequisites to the imposition of sanctions. *Donaldson v. Clark*, 819 F.2d at 1559. Accordingly, notice and an opportunity to respond will ordinarily provide adequate procedural safeguards. *Id.* at 1560–61; *see also Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir.1986) (due process does not mean, necessarily, that an evidentiary hearing must be held), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

Adequate procedural safeguards have been met here. Guinness notified the Court by letter dated May 24, 1990 and copied to Warshay's counsel, of its intention to move for summary judgment and for sanctions. Guinness so moved, giving Warshay adequate opportunity to respond. As we have indicated, Warshay responded in part by pointing to "an increased recollection of trivial details." Pltf.Mem. at 56. Warshay further responded by stating, in his third affidavit, that he still regards London as having been the center of his investment banking operations (Warshay 7/9/90 Aff. ¶ 11), and by minimizing his New York contacts (*id.* ¶¶ 13–18, 32–35). *See also* Pltf.Mem. at 5–6 (describing Warshay's operations); 22–27 (comparing Warshay's London and New York contacts). These responses indicate that Warshay has had notice of the issues presented by Guinness's Rule 11 motion, and has responded fully. They do not, however, excuse Warshay's failure to identify any of his New York contacts in his brief and affidavit in opposition to Guinness's first motion for summary judgment. To deter such abusive litigation practices, Warshay and his counsel are each directed to pay a $2,500 fine to the Court. *See Four Keys Leasing & Maintenance Corp. v. Simithis*, 849 F.2d at 774 (approving $2,500 fine to be paid to the court); *Dore v. Schultz*, 582 F.Supp. at 158 (imposing $200 fine to be paid into the registry of the court).

■ Guinness also moves for sanctions pursuant to Rule 56(g), which provides in relevant part:

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees....

Fed.R.Civ.P. 56(g). Had Warshay, in his second affidavit, simply recounted the facts and circumstances surrounding his alleged agreement with Guinness, we might be unable to conclude that the affidavit was presented in bad faith or solely for the

purpose of delay. In his affidavit, however, Warshay reveals his thorough understanding of the legal issues involved and the importance of downplaying his New York contacts. He states,

> I have been advised by my counsel that Guinness argues that New York statutory law, which would bar my claim, should be applied to this transaction in view of New York's interest in the outcome necessarily based upon the alleged numerous contacts which New York State has had with this transaction. As will be evident below, New York has not had a single contact with any aspect of the promise which is the basis for this litigation.

Warshay 5/19/89 Aff. ¶¶ 3-4. Warshay conveniently ignores his affiliation with Arthur Young's New York office and his meeting with Riklis in New York. If Warshay had been forthcoming in this affidavit, it may not have been necessary to deny Guinness's first motion for summary judgment. We are constrained to conclude that Warshay submitted the affidavit in bad faith or solely for the purpose of delay.

As to the amount of an appropriate sanction, we must determine the amount of reasonable expenses, including attorney's fees, which the filing of the affidavits caused Guinness to incur. Guinness is entitled only to those expenses it would have been necessary to incur to determine whether or not Warshay's "London office" was his exclusive office in 1986 and early 1987, and not all expenses it incurred in filing its second motion for summary judgment and in conducting discovery. Because a short deposition of Warshay would have been sufficient, $10,000 is an appropriate award of attorneys' fees.

## IV. CONCLUSION

Guinness's motion for summary judgment is granted.

Guinness's motion for sanctions pursuant to Rule 11 is granted, and Warshay and his counsel are each directed to pay $2,500 to the Court within twenty (20) days of the entry of this order. Guinness's motion for sanctions pursuant to Rule 56(g) is also

granted, and Guinness is awarded $10,000 in attorneys' fees, for which Warshay and his counsel are jointly and severally liable.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.