Raymond A. **HUNT,** Sr., Jerome Bambach and Steven G. Erickson, Plaintiffs,

v.

**TEKTRONIX, INC.,** Defendant.

No. 93–CV–6319L.

United States District Court,
W.D. New York.

Feb. 5, 1997.

Darcy E. Gruttadaro, Harris, Beach & Wilcox, Rochester, NY, Lonny H. Dolin, Dolin & Associates, P.C., Rochester, NY, for Raymond A. Hunt, Sr., Jerome Bambach, Steven G. Erickson, Roger R. Williams.

Todd R. Shinaman, Marion Blankopf, Susan S. Robfogel, Nixon, Hargrave, Devans & Doyle, L.L.P., Rochester, NY, Christine Kitchel, Stoel, Rives, Boley, Jones & Grey, Portland, OR, Michael Delikat, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for Tektronix, Inc.

## DECISION AND ORDER

·LARIMER, Chief Judge.

This is an age discrimination case brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") and New York's Human Rights Law, New York Executive Law § 290, *et seq.* ("NYHRL"). Presently before me is defendant's motion for summary judgment and defendant's motion for sanctions. For the reasons set forth below, the motion for summary judgment is denied in part and granted in part. The motion for sanctions is denied.

## BACKGROUND

Defendant Tektronix manufactures and supplies, *inter alia,* electronic testing and measuring products and systems. Plaintiffs are former employees in Tektronix' Test and Measurement ("T & M") Division, who sold test and measurement equipment in Western New York and Northern Pennsylvania.

Plaintiffs were laid off as part of a firm-wide reduction in force in the spring of 1992.

Plaintiff Raymond A. Hunt ("Hunt") was hired by Tektronix in June 1982. At the time he was laid off he was the Rochester Area Sales Manager and was 51 years old. He supervised the other plaintiffs, each of whom serviced clients within his geographic area.

Plaintiff Jerome Bambach ("Bambach") was hired by Tektronix in April 1975. At the time he was laid off, Bambach was Senior Sales Engineer and was 50 years old. His primary client was Kodak, located in Rochester, New York.

Plaintiff Steven G. Erickson ("Erickson") was hired by Tektronix in August 1988. At the time he was laid off, he was Sales Engineer and was 47 years old. His primary clients were General Electric and Xerox, also located in Rochester, New York.

Plaintiff Roger R. Williams ("Williams") was hired by Tektronix in April 1967. At the time he was laid off he was a Consulting Sales Engineer and was 51 years old. Williams' sales responsibilities were divided between several geographic accounts in Northern Pennsylvania and IBM, in New York.

In the late 1980's and early 1990's, the volume of Tektronix' T & M business steadily declined due to a variety of circumstances including decreasing demand for products because of reduced defense spending and increased competition and expenses. In an effort to respond to these circumstances, the company went through several restructurings, including some staff reductions.

During this period, Jim Koehn ("Koehn") was Tektronix' National Sales Manager. He was charged with making whatever changes were necessary to reverse the downward slide in sales. As part of his effort, in early 1991 Koehn hired Sherm Willows ("Willows") to be the Eastern Region Sales Manager. At this time, Koehn was 50 and Willows was 54 years old.

Koehn effected a restructuring of the T & M Division in late 1991. The company's fiscal performance continued to deteriorate and in January 1992 senior management determined that further workforce reductions would be required, including approximately one hundred T & M employees nationwide.

In late January 1992, Koehn directed Willows to determine how best to consolidate sales areas and staff within his region in order to achieve the necessary cost savings. Faced with this directive, Willows decided to eliminate the Rochester Area. In March 1992, Willows informed Hunt, the Rochester Area Sales Manager, that he was being laid off and that his territory was going to be divided between the New England, the NY/NJ/PA, and the Mid–Atlantic Sales Areas. Thus, plaintiffs Bambach and Erickson's sales territories were absorbed into the Mid–Atlantic Area, and plaintiff Williams' sales territory was divided between the New England and the NY/NJ/PA Sales Areas.

At this time Willows further delegated the responsibility for deciding who would be laid off to the Area Sales Managers for those sales areas. The Area Sales Manager for the New England Area was Sue Miner ("Miner"); the Area Sales Manager for NY/NJ/PA was Michael Oliveri ("Oliveri"); and the Area Sales Manager for the Mid–Atlantic Area was Scott Bausback ("Bausback").

Subsequent to an Area Sales Managers meeting in March 1992, Bausback determined that Bambach and Erickson would be laid off, and informed them of his decision. Minor and Oliveri determined that Williams would be laid off, and Oliveri informed him of their decision.

Plaintiffs allege that Tektronix deliberately sought to eliminate older salesmen and hire new, younger persons into its sales force. Thus, plaintiffs allege that their termination was the result of Tektronix' intent to discriminate against them due to their age, in violation of the ADEA and the New York Human Rights Law. Plaintiffs also assert that their termination was the result of a neutral policy causing disparate impact on them, in violation of the ADEA.

Tektronix asserts that age had nothing to do with the plaintiffs' terminations and that the 1992 layoffs were driven by legitimate business needs. Tektronix moves for summary judgment on the grounds that plaintiffs

have failed to meet their burden of establishing unlawful discrimination in violation of the ADEA and/or the New York Human Rights Law. Additionally, Tektronix asserts that plaintiffs' disparate impact claim—under the ADEA—cannot be sustained as a matter of law.

## DISCUSSION

### A) *Summary Judgment Standards*

Pursuant to Fed.R.Civ.P. 56(c), a moving party is entitled to a judgment as a matter of law if there is "no genuine issue as to any material fact" and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). However, at the summary judgment stage, when perusing the record to determine whether a rational fact-finder could find for the non-moving party, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. Nat'l Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The general principles underlying a motion for summary judgment apply no less to this action simply because it is an employment discrimination case. It is true that courts exercise caution when considering whether to grant summary judgment in cases where an employer's intent is at issue. *See, e.g., Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). However, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 40 (2d Cir.1994). For a plaintiff in a discrimination case to survive a motion for summary judgment, he must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.) *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he must offer "concrete particulars" to substantiate the claim. *Id., cited in, Duprey v. Prudential Ins. Co.,* 910 F.Supp. 879 (N.D.N.Y.1996).

### B) *Summary Judgment Analysis in ADEA Cases*

The ADEA provides that it "shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also provides that it shall be unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive ... any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). Specifically, this law applies to individuals who are at least forty years of age. 29 U.S.C. § 631(a).

### C) *Disparate Treatment—Pretext Theory*

When analyzing a summary judgment motion in an ADEA case based upon circumstantial evidence, courts apply the so-called *McDonnell Douglas* analysis:

> [f]irst the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection ..." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1973)). *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

▄ To establish a prima facie case of wrongful termination under the ADEA, a plaintiff must show that: (1) he is a member of the protected category; (2) he was qualified for his position; (3) he was terminated; and (4) the termination occurred under circumstances giving rise to an inference of age discrimination. *See Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 716 (2d Cir.1994). In establishing this prima facie case a plaintiffs burden is *de minimis. Chambers*, 43 F.3d at 37.

▄ In cases where a plaintiff articulates a prima facie case and the defendant proffers a legitimate reason for the termination, the analysis often turns on the last prong of the *McDonnell Douglas* test, *i.e.*, whether a plaintiff can establish that the rationale offered was a mere pretext for discrimination. *See Viola*, 42 F.3d at 716. In such cases, to defeat the employer's motion for summary judgment, the "plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief and (2) [it is] more likely than not that the employee's age was the real reason for the discharge." *Id.* (citing *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994) and *St. Mary's Honor Center*, 509 U.S. at 515, 113 S.Ct. at 2751–52). "At all times the burden of persuasion remains with the plaintiff, who must prove by a preponderance of the evidence that any seemingly legitimate reason proffered by the employer is, in reality, a pretext for unlawful discrimination." *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 20 (2d Cir.1996).

In this case, plaintiffs have presented sufficient evidence to establish a prima facie case[1], and Tektronix has offered a legitimate, nondiscriminatory reason for the plaintiffs' layoffs. Thus, my analysis turns on the last prong of the *McDonnell Douglas* test. I will examine the plaintiff's proof to determine whether it satisfies the higher burden of establishing a material issue of fact as to whether Tektronix' asserted reason for their layoffs is false or unworthy of belief, and it is more likely than not that the layoffs were motivated by discrimination. I will start by reviewing Tektronix' stated reasons for plaintiffs' discharge.

### 1) Tektronix' Stated Reasons for The Layoffs

Tektronix asserts that these four plaintiffs were laid off solely because of economic factors and not discriminatory animus. As noted, Koehn assigned to Willows the task of determining how to cut costs and reduce staff as part of the T & M Division's 1992 reduction in force. Willows allegedly decided to eliminate the Rochester Sales Area because it had the smallest volume of sales and the outlook for future significant sales growth was poor because IBM and Kodak sales were expected to decline. Thus, because Hunt was the Rochester Area Sales Manager, he was chosen for layoff.

Eliminating the Rochester Area and its Sales Manager meant that this geographic area would be split between the MidAtlantic, the NY/NJ/PA or the New England Areas. Tektronix asserts that Willows assigned those Area managers (Miner, Oliveri, and Bausback) the task of deciding who else would be laid off.

Bausback claims that he made the decision to terminate Bamback and Erickson. Faced with the company mandate to reduce costs and staff, Bausback made the decision to layoff two salespersons in New York state. He consulted with Hunt to determine who would be most suitable.

▄ Bausbach claims that 90% of Bambach's sales were to Kodak, which had been a disappointing customer for a couple of years

---

1. The plaintiffs have offered largely the same proof to support both their prima facie case and to demonstrate that Tektronix' stated reasons for the layoffs are pretextual. Thus, my analysis of the plaintiffs' prima facie case is subsumed within my analysis of pretext. *See infra.*

and to which sales were expected to continue to decline. Bausbach claims that Erickson's responsibilities were primarily to GE and Xerox. GE's orders through Erickson were predominately for smaller items,—the bigger ones being sold through another product specialist salesman. It appeared that sales by Erickson to GE would remain "flat." Sales to Xerox were similarly insufficient and expected to decline because Xerox was moving toward renting equipment instead of purchasing it.

Accordingly, Bausback selected Erickson and Bambach for layoff and shifted their sales responsibilities to one Marc Ragus (age 32), who already had a significant number of other clients in the same geographic area. Bausback determined that it would be more efficient for Ragus to take on two additional accounts than for either Erickson or Bambach to take on the large number of clients serviced by Ragus.

Regarding Williams, his sales responsibilities were divided: Williams sold equipment to a variety of customers throughout northern Pennsylvania, and to IBM facilities in New York. Miner determined that Williams' sales to IBM could be absorbed by one Jeff Salamon (age 31), who already sold to IBM at other New York locations and was thus familiar with the IBM contact persons. Salamon's familiarity with the client, as well as his geographical proximity to all of the IBM plants and offices made him the preferred choice because Williams' sales to IBM had been fairly flat and he lived considerably further from the many IBM facilities than did Salamon (and was not interested in relocating).

Oliveri then tried to determine if Williams' sales in Pennsylvania were sufficient to justify an exclusive sales role there. Although Williams had a handful of clients in Pennsylvania, his overall sales volume was one of the smallest in Oliveri's area. Oliveri also determined that Williams' accounts were not growing. Thus, his accounts were transferred to Peter O'Brien (age 27). Oliveri and Miner selected Williams for layoff.

This explanation by Tektronix constitutes a legitimate, nondiscriminatory reason for its actions. Thus, plaintiffs now must go forward on their ultimate burden of persuasion that this reason is pretext for discrimination.

### 2) Plaintiffs' Pretext Evidence

Notwithstanding Tektronix stated reasons for the layoffs, Plaintiffs assert that evidence of age discrimination can be inferred primarily from four different things: age-related comments made by Koehn and Willows; Tektronix' failure to follow its own layoff policy; the existence of Tektronix' "college hire" program; and statistical evidence.

**Age-related Comments:** Plaintiffs assert that Jim Koehn and Sherm Willows made various age-related remarks over a period of several months just prior to their terminations. In his affidavit, Hunt states that Koehn made age-related comments on three occasions in 1991 and 1992. The first was a social dinner in November 1991, attended by both Koehn and Hunt and their wives. Hunt asserts that during this dinner, Koehn "questioned me at length about when I had last hired a young recent college graduate.... [H]e lectured me about Tektronix's preference for young aggressive Account Managers and about the need to hire women, minorities and young recent college graduates." Hunt Aff't at ¶¶ 18–19. "Koehn told me to hire young college graduates ... because 'their salary is lower than if you hire a more experienced person, and that drives the cost of sales down.'" *Id.* at ¶ 19.

Hunt also alleges that Koehn made age-related comments during two separate sales meetings in February 1992. At the District Managers' Meeting Koehn announced "[s]ince human resources isn't here I can tell you what's on my mind ... we need to hire 'sharks' or 'young aggressive sales engineers and recent college graduates.'" Hunt Aff't at ¶ 22. Hunt states that Koehn made additional comments about his desire to have "young aggressive Account Managers" at the Area Sales Managers Meeting in that same month. *Id.*

Hunt alleges that Willows made similar comments. Soon after Willows was given the task of making reduction in force determinations, Willows "began to articulate his discriminatory belief that Tektronix needed

Account Managers who were young and aggressive. Like Koehn, Willows began to publicly advocate his desire to hire young recent college graduates and retain 'young aggressive sales engineers.'" *Id.* at 26.

Specifically, after Willows spent a day traveling with Erickson in January 1992, Willows said to Hunt that Erickson "does not fit our image" because "he was not a shark." *Id.* at 28. When Hunt asked Willows what a "shark" is, Willows allegedly replied . "a young aggressive sales engineer." *Id.* In contrast, Willows said that he liked Mark Ragus (who was 32), because Ragus was a "shark." *Id.*

Finally, Hunt claims that in January and February 1992, Willows instructed him to hire "fresh outs or college grads ... to make sure we had fresh blood with fresh ideas, fresh engineering ideas, etc. in the organization." *Id.* at ¶ 30.

Koehn denies that he ever "stated, directly or indirectly, that youth was a desired trait for employees in my sales organization." Koehn Aff't at ¶ 17. He explains that he desired aggressive and proactive salespersons to compete in an increasingly difficult business environment, but that "aggressiveness was and is in no way synonymous with youth." *Id.* Finally, he explains that he used the term "shark" to describe "the type of salesperson that could meet the challenges of the nineties", and that it was derived from the well-known sales motivation book, *Swim With the Sharks Without Being Eaten Alive,* by Harvey Mackay. *Id.* Indeed, Koehn notes that he turned 51 in 1992. *Id.* at ¶ 19. No affidavit by Willows is submitted.

Tektronix asserts that these alleged comments are not evidence of age discrimination. As an initial matter, Tektronix strenuously asserts that Hunt's affidavit testimony is not supported by his deposition testimony and that the discrepancy is such that I should disregard the affidavit evidence altogether. Tektronix asserts that Hunt has, at best, exaggerated the facts as described in his deposition and, at worst, made wholesale departures therefrom, and that plaintiffs cannot create an issue of fact by providing affidavits that contradict earlier deposition testimony. *See Mack v. United States,* 814 F.2d 120, 124

(2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"); *see also Stern v. LIT America, Inc.,* 1994 WL 67846 (S.D.N.Y., March 2, 1994); *Beers v. NYNEX Material Enter. Co.,* 1992 WL 8299 (S.D.N.Y., Jan. 13, 1992).

Additionally, Tektronix asserts that plaintiffs cannot create an issue of fact by raising it in an affidavit for the first time, when the subject has been explored at length during a deposition and nothing was said at that time. *See LC Assoc. v. Pensignorkay, Inc.,* 1996 WL 165510 (E.D.Pa.1996).

I agree that in many instances the claims made by Hunt in his affidavit are not precisely the same as those made in his earlier deposition testimony. Indeed, despite his specific affidavit allegations, Hunt conceded at one point during his deposition that he was not sure whether Koehn used the word "young". *See* Hunt Depo. at p. 86 ("Q: Can you remember him ever using the word 'young'? A: I can't—I would say specifically the word 'young,' I can't remember. I mean, it's—") In this and other instances, Hunt's affidavit testimony appears to overstate his earlier testimony.

Although Hunt's hyperbole is troubling, his deposition testimony is not entirely inconsistent from his affidavit testimony. For instance, in his deposition Hunt stated that both Koehn and Willows frequently used the term "shark," and defined the term as "young, aggressive sales engineers." Hunt Depo. at 190–91. Hunt stated that Koehn used the term at sales meetings, after announcing that "I can tell you what's on my mind because [human resources] isn't here ..." *Id.* Hunt also stated that both Willows and Koehn stressed the financial importance of hiring "young, recent college graduates" because their salaries were lower. *Id.* at 78.

Hunt's deposition testimony also is consistent with his affidavit testimony about Willows and what Willows said after spending a day with Erickson. *See id.* at 189 (Erickson not a "shark"—a "young, aggressive sales engineer.")

Finally, although Hunt subsequently questioned his response when pressed, he initially asserted during his deposition that he believed Koehn used the word "young" when discussing the college hire program at a dinner attended by both gentlemen and their wives. *Id.* at 86.

Thus, while Hunt's deposition testimony is not as compelling nor as precise as his later affidavit testimony, it is not wholly contradictory. Accordingly, I will not disregard Hunt's affidavit for purposes of deciding this summary judgment motion. The discrepancies are not as extreme as in the cases cited by Tektronix, where there were clear contradictions. *See, e.g., Mack,* 814 F.2d at 124 (affidavit testimony—"I was coerced into giving ... urine analysis"—contradicted earlier deposition testimony—"I was totally cooperative ... and happy to provide any information they wanted."); *Beers,* 1992 WL 8299 (S.D.N.Y.1992) (affidavit testimony that defendant made age-related comments not supported in deposition where he denied knowing of any age-related statements). To the extent Hunt's recollections have changed, the reasons therefor may be explored on cross-examination and weighed by the finder of fact.

■ Addressing their merits, Tektronix asserts that these alleged age-related comments cannot form the basis for denying summary judgment because Koehn was not the decision-maker relative to any of the plaintiffs and Willows was not the decision maker relative to three of them (all but Hunt). Tektronix asserts that because Koehn assigned all responsibilities for deciding who should be laid off to Willows, comments made by Koehn are irrelevant. And because Willows assigned the decision-making responsibilities to Area Managers Miner, Oliveri, and Bausback, his comments are irrelevant as to every one but Hunt.

I disagree. This is not a case where the evidence is limited to one or two comments made to one or a few people. *See, e.g., Corcoran v. GAB Business Serv.,* 723 F.Supp. 966 (S.D.N.Y.1989) (summary judgment for employer where no evidence existed other than two isolated comments by nondecision-makers). Rather, if plaintiffs' allegations are true, Koehn openly and repeatedly espoused these views at sales meetings, attended by all district and area sales managers, as a mandate for the future survival of Tektronix. As alleged, Koehn's message was delivered in the form of a directive to those he supervised—directly or indirectly.

Similarly, Willows implied to Hunt, then an area sales manager, that he needed to reconfigure his sales force in accordance with this philosophy.

Thus, this philosophy may have been pervasive within the T & M Division. Accordingly, Tektronix' claim that Koehn was not directly responsible for laying off any of the plaintiffs (and Willows not directly responsible for laying off three of the plaintiffs) does not necessarily preclude a finding of liability against Tektronix based upon a pervasive corporate hiring policy espoused by Koehn and Willows. *See Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 333 (3d Cir.1995) ("[A] supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination."); *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 641 (3d Cir.1993)("The court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions."); *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 54 (3d Cir.1989)("When a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman."), *overruled on other grounds, Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089 (3d Cir. 1995); *see also Cline v. Roadway Exp., Inc.,* 689 F.2d 481, 488 (4th Cir.1982) (where the Circuit upheld admission of evidence that at managers' meetings certain managers stated that a corporate policy was designed to replace older workers with younger, better qualified ones).

Moreover, plaintiffs dispute Tektronix' claim that Koehn and Willows were not the relevant decision-makers. According to Hunt, Bausback claimed that he was *directed* by Willows to layoff Bamback and Erickson. This admission, if true, suggests that Willows may have had a greater role in the decision-making process than Tektronix asserts. Such a factual dispute must be resolved by a fact finder.

Tektronix also asserts that the alleged comments made by Koehn cannot be evidence of discrimination because they were not directed at any of the plaintiffs specifically, they were too remote in time to be tied to the layoffs, and that they were ambiguous. Tektronix asserts that "young and aggressive" does not necessarily correlate with age.

I disagree. While it is true that some of the comments allegedly made by Koehn were at a social dinner several months prior to the layoffs, others allegedly were made at sales meetings two months prior to the layoffs. I find that this is a sufficient nexus between the two. Further, to the extent the comments were ambiguous, I decline to determine what they meant: such determination is properly made by the finder of fact.

Thus, I find that the alleged age-related comments are sufficient to raise a material issue of fact as to whether Tektronix' stated reasons for terminating the plaintiffs were pretextual. The parties dispute whether the alleged comments were made. If they were made, they create a material issue of fact as to whether Tektronix' asserted reasons for discharge are false or unworthy of belief, and that it is more likely than not that the plaintiffs' ages were the real reason for the discharge. *See Viola*, 42 F.3d at 716. While I

find this to be a close call and have some doubt that a jury would find Koehn and Willows' comments indicative of age animus, the United States Court of Appeals for the Second Circuit has made it clear that in circumstances such as these, it is the finder of fact and not the court on summary judgment, that must make this determination.[2]

**Plaintiffs' Other Bases for Inferring Discrimination:** Plaintiffs further assert that evidence of discrimination can be found in the Tektronix Layoff Policy. Under Guidelines for Selection of Employee, this Policy states that

[s]election of regular employees for layoff should be made on the basis of skill and expertise ... [but] [w]here skill and expertise are considered ... to be essentially equivalent, reverse length of company-wide service will be used as the deciding factor.

However, this policy statement is modified by a later clause that states:

Where only one employee is in a particular skill requirement, function, position or job, and that skill requirement, function, position or job no longer is needed, the employee may be laid off without consideration of skill, expertise or length of service.

Plaintiffs assert that their jobs were not eliminated and, thus, the modifying clause is inapplicable. Plaintiffs further assert that their skill and expertise was equal to or greater than that of those who survived the layoff. Thus, they assert that Tektronix violated the Layoff Policy.

Tektronix asserts that each of the plaintiff's jobs **was** eliminated and, thus, Tektronix properly adhered to the modifying clause of the Layoff Policy. Moreover, even if their

**2.** I note, however, that some claims by plaintiffs do not pass muster. For instance, plaintiffs further claim that a statement made by Tektronix President Jerry Miller is age-related. In a magazine interview, Miller stated:

"It seems to me that many Tektronix employees do not want to change. They want life the way it was in the 1950's. I'd certainly like to be a 19 year old again playing basketball, so I don't see that as an unusual phenomenon. But I do believe adaptability is something the Tektronix population is going to have to deal with because there are some things that are going to have to change...."

I do not find this comment to be age-related. Rather, the comment appears to reflect Miller's recognition that the business climate had changed and change within the company was necessary to meet the new challenges. Thus, I reject plaintiffs' assertion that the statement raises an inference of discrimination.

Additionally, I reject the plaintiffs' assertion that an inference of discrimination can be drawn from Erickson's claim that the congenial tone of a conversation with Willows changed after Willows learned of Erickson's age. These "feelings" of Erickson's do not constitute competent evidence to defeat a summary judgment motion.

jobs were not eliminated, Tektronix disputes that the plaintiffs' skill and expertise were comparable to those individuals who were not laid off. Thus, Tektronix asserts that the Layoff Policy was correctly followed.

In sum, the parties dispute whether "jobs" or "people" were eliminated by the Tektronix reduction in force, as well as the plaintiffs' skill and expertise, compared with those who survived the layoff.

Plaintiffs also claim that the contemporaneous hiring of college students while effecting the layoffs is evidence of discrimination. During the relevant time period, Tektronix had a so-called "college hire" program whereby it recruited college graduates to join its sales staff. Plaintiffs assert that because young people were being hired out of the college hire program at the same time Tektronix was laying off dozens of other (older) individuals, the college hire program alone is evidence of age discrimination.

Tektronix defends the college hire program by asserting that in 1992, only 7 persons were hired through the program in the Eastern Region of the United States,—too few to raise an inference of discrimination. Tektronix further points out that one of the college hires was Bonnie Zechmann, who was 41 years of age at the time. This, asserts Tektronix, is evidence that the College Hire program was not discriminatory.

Plaintiffs also have proffered statistical evidence that they claim supports their position. Tektronix has attacked plaintiffs' evidence and proffered its own statistical evidence supporting its position. The parties vigorously dispute the others' statistical conclusions and the data from which such conclusions are derived.

■ Because I have determined that the alleged age-related comments are sufficient to defeat Tektronix' motion for summary judgment, it is not necessary for me to discuss at length the multitude of issues surrounding the Layoff Policy, the College Hire Program, and the statistical evidence. I note that failing to follow the Layoff Policy, without more, is· not necessarily evidence that the ADEA has been violated. Nor is the existence of a College Hire Program in a company that is otherwise feeling the strain of restructuring and downsizing. *See In re Western District Xerox Litigation*, 850 F.Supp. 1079, 1089 (W.D.N.Y.1994) ("It is difficult to imagine a corporation this large never having to hire new employees in some areas, even during an overall reduction in force."). However, I find that these matters, taken together with the questions raised about the alleged age-related comments, are sufficient to raise triable questions regarding whether age was a factor in these plaintiffs' layoffs. Thus, to the extent relevant and admissible, evidence concerning these areas may be introduced at trial.[3]

For the above-stated reasons, plaintiffs' disparate treatment claim is sustained. Because the legal standards for establishing age discrimination under the NYHRL are comparable to the legal standards under the ADEA—*see Miller Brewing v. State Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985)—plaintiffs' NYHRL claim is sustained as well.

---

3. In addition to their pretext theory, plaintiffs assert that they have direct evidence sufficient to support application of a "mixed motives" analysis to their disparate treatment claim. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see also de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16 (2d Cir.1996). In a mixed motives case, a plaintiff must proffer evidence that an impermissible criterion was a substantial factor in an employment decision. Once done, the burden shifts to the defendant to demonstrate that it would have reached the same decision even in the absence of the impermissible factor. *See de la Cruz,.* 82 F.3d at 23. Because plaintiffs' pretext evidence is sufficient to defeat Tektronix'

motion for summary judgment, it is unnecessary for me to determine at this time whether the evidence also merits treatment under a mixed motives analysis. This issue can be revisited if necessary at trial. *See Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 186 (2d Cir.1992) ("if sufficient evidence is presented at trial to permit an inference that the forbidden motivation has been 'shown', the matter is to be submitted to the jury with the instruction that, if the jury is persuaded that the plaintiff has so 'shown', the burden shifts"); *see also Kirschner v. Office of the Comptroller of New York*, 973 F.2d 88 (2d Cir. 1992); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

## D) *Disparate Impact*

 Plaintiffs also assert a "disparate impact" theory of age discrimination. Disparate impact describes a facially neutral policy or test that impacts one class of employees more harshly than another and cannot be justified by business necessity. *Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2d Cir. 1992). Proof of discriminatory intent is not necessary. *See Diehl v. Xerox Corp.*, 933 F.Supp. 1157, 1164 (W.D.N.Y.1996).

 Tektronix moves to dismiss this claim as a matter of law, asserting that recent case developments have rejected the disparate impact theory as a viable cause of action under the ADEA. Tektronix further asserts that even if the claim can be made, plaintiffs have failed to establish a prima facie case of disparate impact discrimination.

The United States Court of Appeals for the Second Circuit has upheld use of the disparate impact theory in age discrimination cases. *See Maresco*, 964 F.2d at 115. While Tektronix asserts that recent Supreme Court case law casts such holding into doubt—citing *Hazen Paper v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) and *O'Connor v. Consolidated Coin Caterers Corporation*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)—, these cases have not definitively overruled *Maresco*. Thus, I am bound to allow plaintiffs' claim for disparate impact to remain. Until the Second Circuit pronounces otherwise, disparate impact claims may be asserted under the ADEA and district courts such as this one must recognize them. *See Diehl v. Xerox Corp.*, 933 F.Supp. 1157, 1165–1166 (W.D.N.Y.1996); *Krueger v. New York Telephone Co.*, 1993 WL 276058 (S.D.N.Y.1993).

 I now turn to the merits of plaintiffs' disparate impact claim. In order to establish a prima facie case of disparate impact discrimination, plaintiffs must demonstrate that a "specific employment practice [has] an adverse impact upon members of the protected class, ... and then show causation, ..., *i.e.*, 'that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity.' " *Maresco*, 964 F.2d at 115 (citations omitted).

 Plaintiffs assert that Tektronix "maintained a discriminatory policy and/or practice of terminating older individuals within the protected class in the sales force, to achieve an overall younger sales force." Complaint at ¶ 70. Plaintiffs further assert that "[Tektronix'] discriminatory policy and/or practice of terminating older employees had a disparate impact" on each of the plaintiffs. Complaint at ¶¶ 72–75.

Tektronix asserts that these claims cannot constitute the basis for a disparate impact claim for the reason that they essentially restate the plaintiffs' disparate treatment claims. I agree. These allegations identify an intentionally discriminatory policy and then assert that the policy had a disparate impact. They cannot be the bases for a disparate impact claim. *See Maresco*, 964 F.2d at 115 (dismissing a disparate impact claim where the plaintiff's "facially neutral employment practice ... coalesces with the discharge which he claims to have constituted disparate treatment"); *see also Verney v. Dodaro*, 872 F.Supp. 188, 193 (M.D.Pa.1995) (where court found "nonsensical" plaintiff's contention that her employer's alleged policy of intentionally discriminating against women caused a disparate impact on women), *aff'd*, 79 F.3d 1140 (3d Cir.1996).

In their responsive memorandum, plaintiffs contend that the specific employment practice "at issue" is Tektronix' layoff policy. However, plaintiffs do not allege that the policy itself, applied as written, causes a disparate impact. They allege that it is Tektronix' failure to follow the policy that causes a disparate impact. This too is nonsensical. To the extent the plaintiffs assert that Tektronix has diverged from the policy and used unauthorized criteria in layoff determinations, then their claim merges with their disparate treatment theory that Tektronix intended to discharge the older employees in favor of the new ones. Plaintiffs' disparate impact claim is dismissed.

## E) *Sanctions*

 Finally, Tektronix moves for sanctions pursuant to Fed.R.Civ.P. 56(g).

The plaintiffs initially responded to Tektronix' motion with, *inter alia*, an attorney affidavit ("Dolin Affidavit") authored by Lonny H. Dolin, Esq., which purported to describe the plaintiffs' case in significant detail, including each of the plaintiff's allegations. Tektronix moved to strike the Dolin Affidavit on the grounds that it contained statements not made on personal knowledge. Tektronix also moved for sanctions pursuant to Fed. R.Civ.P. 56(g). I granted Tektronix' motion to strike,[4] but reserved on its application for sanctions.

Fed.R.Civ.P. 56(g) states as follows:

Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

Tektronix asserts that sanctions are appropriate because the "Dolin Affidavit could only be construed as an effort to mislead the Court that material issues of fact exist." Tektronix further asserts that the Rule 56(g) "bad faith" standard is met where an affiant "presents a misleading factual picture so that the Court receives a distorted view" and where the affiant "had a thorough understanding of the legal issues involved" and thus knew the importance of his/her representations. Tektronix asserts that malice or ill-will is not required.

Tektronix seeks compensation for the time and expenses incurred moving against the Dolin Affidavit. Not only did Tektronix have to move against the affidavit, but Tektronix' counsel twice was required to travel from New York City to Rochester to appear before the Court because argument on the merits of Tektronix' motion was aborted during the first hearing after the Court granted Tektronix' motion to strike. Argument on

the merits of the motion for summary judgment was rescheduled for a later date.

Dolin defends the submission of her original affidavit. She contends that she intended no harm by her actions and that, in fact, she thought the affidavit form was appropriate. Dolin cites to cases where courts have accepted attorney affidavits as "road maps" and suggests that she was merely trying to create a road map for the court. She notes that the substantive assertions made in the offending affidavit subsequently have been asserted in affidavits submitted by the plaintiffs themselves, thus remedying any question of personal knowledge.

In support of its motion Tektronix relies upon *SMS Assoc. v. Clay*, 868 F.Supp. 337 (D.D.C.1994), *aff'd*, 70 F.3d 638 (D.C.Cir. 1995) and *Warshay v. Guinness PLC*, 750 F.Supp. 628 (S.D.N.Y.1990), *aff'd*, 935 F.2d 1278 (2d Cir.1991). In *SMS Assoc.*, the court awarded rule 56(g) sanctions against a litigant who had "engaged in dilatory tactics expressly designed to prolong [ ] already unduly protracted litigation." *Id.* at 344. That case that had been going on for over 10 years. The court also found that in addition to presenting affidavits in bad faith, the litigant had made untrue representations under oath.

In *Warshay*, a litigant omitted critical facts from an affidavit and simultaneously represented that he understood the legal importance of his representations. Based upon these simultaneous actions, the court awarded attorneys' fees pursuant to Rule 56(g). *Id.* at 640–41.

Neither case cited by Tektronix supports an award of Rule 56(g) sanctions in this case. Ms. Dolin's actions are not comparable to those of the affiants in *SMS Assoc.* or *Warshay*. While Ms. Dolin's actions were unfortunate, I do not find that they deliberately were taken in bad faith for purposes of Rule 56(g) sanctions. Therefore, the motion for sanctions is denied.

### CONCLUSION

For the reasons stated above, Tektronix motion for summary judgment (# 25) is de-

---

**4.** I also permitted plaintiffs to resubmit their opposition to Tektronix' motion. My analysis of

the merits of Tektronix' motion, thus, was based upon the plaintiffs' revised submission.

nied in part and granted in part. Plaintiffs' disparate treatment claims under the ADEA and the NYHRL are sustained; their disparate impact claim under the ADEA is dismissed. Tektronix' motion for sanctions (# 36) is denied.

IT IS SO ORDERED.